**CITY OF ALMA and Bacon County, Georgia, Plaintiffs,**

v.

**The UNITED STATES of America and The United States Environmental Protection Agency, Defendants.**

**NATIONAL WILDLIFE FEDERATION, et al., Plaintiffs,**

v.

**John O. MARSH, et al., Defendants.**

**Nos. CV589–51, CV582–98.**

United States District Court,
S.D. Georgia,
Waycross Division.

Aug. 24, 1990.

1548

J. Jimmy Boatright, M. Theodore Solomon, II, Solomon & Edgar, Alma, Ga., James S. Stokes, Sydney S. Cleland, Robert D. Mowrey, Alston & Bird, Atlanta, Ga., for plaintiffs.

W. Christian Schumann, U.S. Dept. of Justice, Land and Natural Resources Div., Environmental Defense Section, Washington, D.C., Henry L. Whisenhunt, Jr., Augusta, Ga., Ruth Bell, Catherine Winer, Water Div., U.S. Environmental Protection Agency, Washington, D.C., Edwin R. Schwartz, Asst. Regional Counsel, U.S. Environmental Protection Agency, Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, Chief Judge.

The case before the Court represents the culmination of nearly two decades of struggle on the part of the officials of Alma, Georgia, the plaintiffs in this action, to build a recreational lake, aptly named Lake Alma, in Bacon County. Almost since its inception, the project has been opposed by environmental groups, certain citizens, and a few federal agencies, particularly the Environmental Protection Agency ("EPA" or "the Agency"), one of the defendants here. The plaintiffs have hurdled numerous bureaucratic obstacles and endured four separate lawsuits in their effort to build the lake. In the action currently before the Court, the plaintiffs ask the Court to set aside yet another administrative roadblock: the decision of the EPA to restrict designation of the project area as a discharge site for dredged or fill material under section 404(c) of the Clean Water Act, an action which effectively prohibits construction of Lake Alma. City officials claim that the lake will be a boon to the area; the EPA dubs it a boondoggle. Now, the Court must decide, on cross-motions for summary judgment, which characterization is more accurate.

## BACKGROUND

### I. The Early Years

In 1968, the Department of Housing and Urban Development ("HUD") selected the city of Alma, Georgia to receive funds under the Model Cities Program. To use these funds effectively, city officials formulated a development plan consisting of four projects: 1) the improvement of Alma's industrial park, 2) the upgrade of water and sewage treatment facilities, 3) improvement of the airport, and 4) construction of a recreational lake to be named Lake Alma. Alma secured funding for the first three projects and eventually completed them.

In 1971, HUD funded a study to determine whether the construction of Lake Alma was feasible.[1] HUD's action prompted several Alma residents to commence a lawsuit the following year, asking that HUD be required to prepare an Environmental Impact Statement ("EIS") concerning the effects of the lake. *See Deen v. Lynn,* CV No. 861 (S.D.Ga. Sept. 20, 1973). The litigation eventually settled after HUD agreed to provide the EIS. HUD issued a draft in 1974, but it engendered much criticism and was subsequently withdrawn. Alma then assumed responsibility for preparing the impact statement.

Alma submitted the EIS in March 1977, and the EPA and the United States Fish & Wildlife Service ("FWS") objected to the lake on environmental grounds. Other opponents of the project brought suit to block HUD's release of funds for construction of the lake. *See Hurricane Protective Soc'y v. Bacon County,* CV No. 577–16 (S.D.Ga. March 25, 1977). On August 10, 1977, HUD decided to withhold the funds. The parties to the action subsequently agreed to stay the proceedings while Alma officials sought a permit from the United States Army Corps of Engineers ("the Corps") under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1988).[2] This case was dismissed in 1980 for want of prosecution.

Alma officials applied for a section 404 permit on August 31, 1977. The Corps' District Engineer recommended denial of the permit and referred the case to the Division Engineer. After an evaluation of the project site, the Division Engineer asked the District Engineer to reassess the permit application. The EPA Regional Administrator recommended that the permit be denied because the project did not conform with the EPA's section 404(b)(1) guidelines,[3] or with the EPA's wetlands policy, and because it would have an adverse impact on water quality. The FWS also recommended denial of the permit,

---

**1.** The proposed site for the lake was in the Hurricane Creek drainage basin, within the lower Atlantic Coastal Plain, approximately 75 miles west of the Georgia coastline. The lake was to be seven miles long and a half mile wide. The project, as initially planned, would require 2,540 acres—1,400 acres for the lake and the remainder for a buffer zone.

**2.** This section reads in part:

(a) The Secretary may issue permits, after notice and opportunity for public hearings, for the discharge of dredged or fill material into the navigable waters at specified disposal sites....

(b) Subject to subsection (c) of this section, each such disposal site shall be specified for each such permit by the Secretary (1) through the application of guidelines developed by the Administrator [of the EPA], in conjunction with the Secretary, which guidelines shall be based upon criteria comparable to the criteria applicable to the territorial seas, the contiguous zone, and the ocean under section

1343(c) of this title, and (2) in any case where such guidelines under clause (1) alone would prohibit specification of the site, through the application additionally of the economic impact of the site on navigation and anchorage. (d) The term "Secretary" as used in this section means the Secretary of the Army, acting through the Chief of Engineers.

**3.** These guidelines are found in 40 C.F.R. § 230 (1989) and are included in the Appendix to this Order. Those of particular significance to the case at hand are section 230.10(c) (restrictions on discharge of dredged or fill material; significant degradations of the waters of the United States), section 230.11(g) and (h) (determination of the cumulative and secondary effects of the discharge of dredged or fill material on aquatic ecosystems), section 230.31 (potential impacts on the biological characteristics of fish, crustaceans, mollusks, and other aquatic organisms in the food web), section 230.32 (potential impacts on the biological characteristics of other wildlife), and section 230.41 (potential impacts on wetlands).

based primarily on the proposed lake's adverse effect on wildlife values.

In 1978, the FWS initiated a study to determine what mitigation would be necessary to offset the habitat losses resulting from construction of Lake Alma. The agency concluded that an estimated 7,246 acres of wooded swamp would have to be managed intensively to compensate for the total net wildlife loss incurred.[4] Noting that complete compensation was impractical, the FWS formulated a mitigation plan. The plan required the construction of 194 acres of greentree reservoirs ("GTRs") which would be managed primarily for waterfowl. The GTRs, 14 discrete impoundments, would be allowed to fill with water and would be drawn down annually. An emergency access road was to be constructed and managed for wildlife diversity with grain crops planted on the right-of-way. In addition, the plan called for the selective clearing of 466 acres of wooded swamp and pine areas by prescribed burning and cutting of trees. The fields, pastures, and rights-of-way would undergo staged disking, seeding, and mowing. According to the FWS, implementation of this plan would provide the "minimum acceptable level of compensation" for the wildlife habitat lost as a result of the lake.

Conditioned upon the employment of its mitigation plan, the FWS withdrew its objections to the project. The following year, the Corps' District Engineer recommended approval of the section 404 permit if the city implemented the mitigation plan. The Division Engineer concurred, and the Corps notified the EPA of its intention to issue the permit. The EPA requested that the permit be elevated to the department level for review, citing concerns that the mitigation plan did not adequately compensate for the loss of wetlands, that the GTRs would have an adverse impact on water quality, and that the GTRs themselves might require section 404 permits. The President's Council on Environmental Quality ("CEQ") voiced its opposition to the mitigation plan as well, stating that the plan calls for the destruction of 200 acres of wetlands in addition to those destroyed by the construction of the lake. The CEQ also noted that the mitigation primarily benefits one species, wood ducks, of particular interest to hunters, and fails to provide appropriate mitigation for the loss of aquatic life associated with the elimination of wetland vegetation.

Pursuant to the EPA's request for elevated review, the highest levels of the Department of the Army ordered that water quality studies be conducted at the project site. After considering the studies, the Assistant Secretary of the Army decided that the permit for Lake Alma should issue. In a letter dated October 9, 1981, EPA Administrator Anne M. Gorsuch responded:

The EPA staff has studied your report and agrees with the conclusion of the Army Corps that the released waters from the nearby greentree reservoirs that will flow into the proposed Lake Alma are not expected to adversely affect its water quality. This report, together with the results of previous analysis, satisfactorily answers the questions of the [EPA] and we conclude that the modified project will conform with the applicable federal environmental statutes and regulations.

On November 10, 1981, the Corps issued the permit for construction of Lake Alma. The permit stipulated the development of the FWS mitigation plan as a condition of issuance. HUD subsequently decided to release the funds for the construction of the lake, provided certain conditions were met.[5]

4. The FWS employed the Habitat Evaluation Procedures developed by it to determine the impacts of the project on wildlife resources. Representatives of the Corps and the Georgia Department of Natural Resources ("DNR"), as well as FWS officials, participated in the study.

5. The conditions were: 1) the EIS would be reviewed and revised if necessary, 2) the project would primarily benefit low- and moderate-income persons, 3) the use of the lands acquired was in compliance with the applicable comprehensive open space plan, and 4) the project description remained unchanged from the most recently approved HUD application. HUD later waived the second condition on the ground that to do otherwise would result in undue hardship

## II. The 1983 Litigation

Several opponents of the Lake Alma project—the National Wildlife Federation, the Georgia Wildlife Federation, and the Hurricane Creek Protective Society, specifically [6]—sued to enjoin HUD's release of funds. *See National Wildlife Federation v. Marsh,* CV No. 582-98 (S.D.Ga. Dec. 3, 1982). They specified a number of grounds for the injunction; only two of their contentions are relevant in the instant case, however. First, the project opponents claimed that Alma city officials or the Corps should have prepared a Supplemental Environmental Impact Statement ("SEIS") before the section 404 permit for the lake was issued or the funds released. According to the petitioners, the Corps' decision to forego preparation of a SEIS was unreasonable because the project had been modified since the submission of the EIS in 1977 by the adoption of the mitigation plan, and these modifications would have a significant environmental impact. Second, they contended that the Corps acted unlawfully by issuing a permit for the lake without first determining whether additional permits would be necessary for the GTRs, and, if the additional permits were needed, by issuing the lake permit without first issuing the permits for the mitigation plan.

The district court refused to grant the injunction, Court Order, CV No. 582-98, dated March 3, 1983, and the petitioners appealed. Before the Eleventh Circuit and in the district court, the government argued that the Corps had acted lawfully. As to the SEIS issue, the government contended that the environmental impacts of the GTRs were no different, quantitatively or qualitatively, from the effects of the Lake Alma project as a whole; thus, a supplemental statement was unnecessary. In support of this contention, the govern-ment emphasized the EPA's conclusion that the GTRs would not adversely affect the water quality of the lake.

Pertaining to the Corps' decision to issue the lake permit without first determining whether construction of the GTRs would require separate authorization, the government referred to the Corps' regulation allowing the imposition of a mitigation plan as a condition *subsequent* to the permit for the project itself. The government discounted EPA's original view that the GTRs might require permits apart from Lake Alma permit and noted that the EPA eventually acquiesced in the Corps' conclusion that the GTRs could be built under a nationwide permit, *see* 33 U.S.C. § 1344(e), or under a permit processed after the lake was approved.[7]

The Eleventh Circuit disagreed with both of the government's contentions. *National Wildlife Federation v. Marsh,* 721 F.2d 767 (11th Cir.1983). First, the court held that the decision of the Corps to forego preparation of a SEIS was unreasonable. According to the court, the mitigation plan would alter the project site by requiring extensive burning, cutting, and flooding. *Id.* at 783. Such activities, the court said, clearly affect the environment. *Id.* Moreover, the plan was bound to have significant environmental impacts, the court noted, since several federal agencies, including the EPA, conditioned their approval of the lake on the plan's implementation. *Id.* at 783–84. Second, the court held that the Corps made a "clear error of judgment" by failing to determine whether the construction of the GTRs required separate permits before issuing the permit for the lake. *Id.* at 784. Most federal agencies agreed that the environmental soundness of the lake was conditioned upon implementation of

and would frustrate the purposes of the statute authorizing funding.

6. Various owners of property that would be affected by the construction of the lake were also plaintiffs.

7. In its appellate brief, the government also discounted the internal policy of the Corps which required that "permits for related activities should be applied for and resolved concur-rently." March 1, 1979, DAEN–CWO–N Directive on Permit Procedures. It argued that this policy was irrelevant because of the separate policy allowing mitigation plans to be imposed after the Corps has issued the project permit. February 13, 1978, DAENO–CWO–N Letter. Brief for Appellee at 46–48, *National Wildlife Fed'n v. Marsh,* 721 F.2d 767 (11th Cir. 1983).

the mitigation plan, but, because of the Corps' failure to determine whether GTR permits were necessary before authorizing the construction of the lake, Lake Alma could be built without the requisite mitigation in violation of federal law. *Id.* In addition, the court noted that the Corps' failure to decide whether permits were needed for the mitigation plan was contrary to its own internal procedures.[8] *Id.* at 784–86.

Accordingly, the Eleventh Circuit reversed the decision of the district court and remanded the case. Subsequently, the district court adopted the decision of the appellate court and enjoined construction of Lake Alma pending fulfillment of two conditions: 1) submission of a SEIS documenting the environmental impacts of the mitigation plan, and 2) issuance of section 404 individual or nationwide permits for the GTRs. Court Order, CV No. 582–98, dated March 28, 1986.

### III. The Aftermath

In early 1986, the EPA advised the Corps to evaluate the impacts of the overall Lake Alma project in the SEIS. The Corps issued a draft SEIS, and in its notice of public hearing concerning the Lake Alma permit, announced that it would accept comments on both the SEIS and the final EIS. In its comments on the draft, the EPA reaffirmed its opposition to the project and indicated that it would consider commencing proceedings under section 404(c)[9] if the Corps proceeded with the permit issuance.

In 1988, the Corps notified the EPA of its intent to issue a section 404 permit for the GTRs and to modify the 1981 lake permit requiring implementation of the mitigation plan. The EPA Regional Administrator then informed the Corps and city and county officials that he would initiate section 404(c) proceedings, proposing to prohibit or restrict the discharge of dredged or fill material at the project site. Thereafter, the EPA published notice of its proposal in the Federal Register, 53 Fed.Reg. 26,859 (1988), and held a public hearing. In response, the DNR and representatives from the city and county submitted comments espousing their support for the project. The DNR, claiming that the project site was not pristine or a particularly high quality habitat, emphasized the economic benefits of the lake, the increased fishery potential, and the aggressive waterfowl program set forth in the mitigation plan. Alma officials contended that the EPA could not address the original permit decision and that the administrative record lacked sufficient information to satisfy the legal standard for action under section 404(c).

On October 5, 1988, the EPA Regional Administrator issued a Recommended Determination proposing that the Agency withdraw specification of the Lake Alma site as a disposal area for the discharge of dredged or fill material under section 404(c). He further recommended that the EPA prohibit discharge in the areas designated for the GTRs. The matter was then placed in the hands of the Acting Administrator for Water, Rebecca W. Hanmer.[10]

---

**8.** *See supra* note 7. The court rejected the government's contention that the Corps' policy, authorizing mitigation plans as a condition subsequent to construction of a project, invalidated the standard procedure requiring consideration of related projects concurrently. According to the court, the record did not indicate that the Corps had developed a consistent condition subsequent procedure, and the usual policy should govern. 721 F.2d at 786.

**9.** Section 404(c) of the Clean Water Act reads: The Administrator is authorized to prohibit the specification (including the withdrawal of specification) of any defined area as a disposal site, and he is authorized to deny or restrict the use of any defined area for specification (including the withdrawal of specification) as

a disposal site, whenever he determines, after notice and opportunity for public hearings, that the discharge of such materials into such areas will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. Before making such determination, the Administrator shall consult with the Secretary. The Administrator shall set forth in writing and make public his findings and his reasons for making any determination under this subsection.

**10.** On two previous occasions, Ms. Hanmer, in her capacity as the Agency's Region IV Administrator, had expressed opposition to the Lake Alma project—once in 1980 in a letter to the

Ms. Hanmer met with city and county officials, who voiced their opposition to the proposed agency action. Several days later, she issued the Final Determination of the EPA. The Agency restricted designation of Hurricane Creek as a discharge site for dredged or fill material associated with the construction of an impoundment, basing its decision on the proposed lake's "unacceptable adverse effects on wildlife." 33 U.S.C. § 1344(c). According to the EPA, the sites for Lake Alma and the mitigation plan provide important wildlife habitat which would largely be eliminated if the project were to go forward. In addition, construction of the lake would destroy an integral link in the forested wetland corridor which is largely undisturbed by major obstructions from Hurricane Creek, through the Alabaha and Satilla Rivers, to the Atlantic Ocean. In support of its conclusion, the EPA cited wildlife evaluations and surveys conducted by the Corps, the FWS, the DNR, the EPA, and individuals who used the Hurricane Creek area for recreational activities.

In response to the Agency's action, the city of Alma and Bacon County brought this action, seeking a declaratory judgment against the United States and the EPA that the section 404(c) restriction be deemed "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1988). They also moved to consolidate the instant case with *National Wildlife Federation v. Marsh*, CV No. 582–98 (S.D.Ga. Dec. 3, 1982), pursuant to Federal Rule of Civil Procedure 42(a), and requested an Order lifting the injunction, imposed by this Court on March 28, 1986, which prohibits the construction of Lake Alma until the satisfaction of certain conditions—namely, the preparation of a SEIS and the issuance of section 404 permits for the GTRs.

The EPA does not object to consolidation, and the Court hereby GRANTS that motion. The Agency does oppose the plaintiffs' motion to lift the injunction, however, claiming that its action under section 404(c) invalidates the permits issued by the Corps;

thus, one of the conditions imposed by the Court has not been satisfied, and the injunction should remain in place. The EPA also argues that its action, restricting specification of the project area as a disposal site for the discharge of dredged or fill material, is supported by the administrative record and therefore is not arbitrary or capricious, and has moved for summary judgment on that ground.

The plaintiffs also have moved for summary judgment, claiming first, that the EPA is barred by the doctrine of judicial estoppel from rejecting the project. In addition, the plaintiffs contend that the Agency's action is arbitrary and capricious because it represents a departure from agency policy and precedent which has not been adequately explained and has insufficient support in the administrative record. The Court disagrees with both of the plaintiffs' contentions.

## SUMMARY JUDGMENT

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Thus, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In cases where the court is asked to review or enforce the decision of a federal administrative agency after evaluation of the record, summary judgment is particularly appropriate. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2733, at 366–67 (1983); *see also Florida Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir.1985).

Corps' District Engineer, and again in 1986 in a memorandum to the EPA Administrator.

## ANALYSIS

### I. Judicial Estoppel

The plaintiffs claim that the EPA is barred, under the doctrine of judicial estoppel, from asserting that Lake Alma is environmentally unacceptable because of the government's "unequivocal" support for the project during the 1983 litigation. According to the plaintiffs, the Eleventh Circuit relied on the government's former position in making its determination, and a reversal by the Agency at this juncture would work an injustice on the Court.

The doctrine of judicial estoppel is a "principle of fairness" employed to safeguard the integrity of the judicial process. 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4477 (1981 & Supp.1990) (hereinafter C. Wright); *Reynolds v. Comm'r of I.R.S.*, 861 F.2d 469, 472 (6th Cir.1988); *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C.Cir.1980). The requirements of the doctrine are "rather vague"; the primary concern of courts applying it is to avoid "unfairness and unseemliness." *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir.1987) (quoting 1A J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* para. .405[8] (2d ed. 1984)); C. Wright, *supra*, at 780. The basis of the doctrine is that, absent a good explanation, "a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." C. Wright, *supra*, at 782 (interpreting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir.1953).

Judicial estoppel is directed toward those who would "play 'fast and loose' with the courts," *Scarano*, 203 F.2d at 513, who blow "hot and cold as the occasion demands," *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1167 n. 3 (4th Cir.1982), who use "intentional self-contradiction ... as a means of obtaining an unfair advantage," *Scarano*, 203 F.2d at 513, and who engage in "cold manipulation" of the judicial system. *Konstantinidis*, 626 F.2d at 939; *ac-*

*cord Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1261 (11th Cir.1988). Courts do not employ the doctrine if no tribunal has been led astray:

> The doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one *successfully* and unequivocally asserted by the same party in a prior proceeding.

*Reynolds*, 861 F.2d at 472 (emphasis added); *Konstantinidis*, 626 F.2d at 939 ("success in the prior proceeding is clearly an essential element of judicial estoppel").

An example may help explain the doctrine. In *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, the plaintiff, an operator of a local movie theater chain, brought an action in state court charging the defendant, a national theater chain, with violations of state law including the state antitrust statute. The defendant removed the action to federal court, contending that the plaintiff's claims were actually federal antitrust claims in disguise. After removal, the defendant moved for dismissal without prejudice under the doctrine of derivative jurisdiction.[11] The district court, in agreement with the defendant's arguments, dismissed the case without prejudice and refused to remand it. The plaintiff moved for reconsideration and submitted an amended complaint, which omitted the antitrust count, with the motion. The court also denied this motion, and the plaintiff appealed.

While the appeal was pending, the plaintiff filed a new complaint, without the antitrust claim, in state court. The defendant requested that the state court stay the proceedings while the appeal on the first action was ongoing, arguing that allowing the state action to proceed could result in duplicative discovery. In opposition to the motion, the plaintiff stated that it would not pursue the antitrust claim, regardless of the outcome of the federal appeal. The state court refused to stay the proceeding.

---

**11.** This doctrine states that a federal court does not have removal jurisdiction over a claim that the state court lacked jurisdiction to decide in the first place. *Id.* at 210 (quoting *Pueblo Int'l, Inc. v. Reichard De Cardona*, 725 F.2d 823, 828 (1st Cir.1984).

The defendant then filed a motion to dismiss the federal appeal on the ground of mootness. The defendant argued, first, that the plaintiff was bound by its representation to the state court that it would abandon the antitrust claim. Next, the defendant asserted that, since the plaintiff was bound, the dispute about whether the antitrust claim should have been remanded rather than dismissed was moot. Last, argued the defendant, since the issue as to the antitrust claim was moot, the entire appeal should be abandoned because the pending state suit involved claims identical to the ones presented in the federal case. In opposition to this motion, the plaintiff renounced its representation that it would not prosecute the antitrust claim, stating that, "if developments in the litigation [made] it appropriate," it would pursue the claim.

The First Circuit concluded that the plaintiff's behavior warranted application of judicial estoppel. The court noted that the plaintiff had made a tactical choice to abandon the antitrust claim and had received the advantage it sought—the state court refused to stay its proceedings. Then, after inducing the state court to rely on its position, the plaintiff reversed itself in federal court in an attempt to receive a favorable disposition there. According to the court, the plaintiff's "self-serving self-contradiction" was exactly the type of behavior the doctrine of judicial estoppel was meant to restrain. *Id.* at 213.

Despite the concerns about intentional inconsistency, courts have recognized that a party may have reasonable grounds for changing positions. The interests of public policy, for example, may justify a reversal, even if the change would be deemed inappropriate as a matter of private interests. C. Wright, *supra,* at 784. In light of the interests of public policy, courts are "very reluctant" to apply estoppel doctrines against the government, *Reynolds,* 861 F.2d at 474; *Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984), especially when the action seeking to be estopped was taken by the government in its sovereign role. *United States v. City of Menominee,*

727 F.Supp. 1110, 1121 (W.D.Mich.1989) (EPA exercises sovereign power when enforcing the Clean Water Act) (citing *Housing Auth. of Elliott County v. Bergland,* 749 F.2d 1184, 1190 (6th Cir.1984)). Courts have therefore required that a party asserting estoppel against the government must show that the government engaged in affirmative misconduct. *United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987) (citations omitted).

The case currently before the Court does not warrant application of judicial estoppel. First, the behavior of the EPA in this case is not akin to "playing fast and loose" with the Court. In the 1983 litigation, the government supported funding for the Lake Alma project, asserting that the preparation of a SEIS was unnecessary and that the necessity for GTR permits could be determined subsequent to the issuance of the permit for the lake. The Eleventh Circuit flatly rejected the government's position on both issues and enjoined construction of the lake until the SEIS was drafted and the GTR permits considered. In the instant case, the government admits that its position on the lake has changed since the previous litigation but explains this divergence as the result of re-evaluation of the project. According to the Agency, its change in position does not amount to manipulation of the judicial system and, if adopted by the Court, would not grant the EPA an unfair advantage. The Court find the EPA's argument persuasive. Unlike the cases in which courts have applied judicial estoppel, no judicial body in this litigation has been misled by the EPA or relied on the Agency's position, to the detriment of the system, when making a judgment.

Further, as noted previously, the Court is extremely reluctant to estop the Agency from enforcing the law. "When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Asmar,* 827 F.2d at 912 (quoting *Heckler v. Community Health Services,* 467 U.S. at 60, 104 S.Ct. at 2224). The EPA has been delegated the

responsibility of enforcing the Clean Water Act and protecting the public interest in this regard. Effective safeguarding of the public interest sometimes may require a change in outlook. Moreover, the plaintiffs have not alleged that the EPA engaged in affirmative misconduct, a necessary prerequisite for the Agency to be estopped. *Asmar*, 827 F.2d at 912.

Because the plaintiffs have not demonstrated that the EPA reversed itself in an attempt to manipulate the judicial process and gain an unfair advantage at the expense of the system, the Court will not estop the government from altering its stance.[12]

## II. Arbitrary and Capricious

■ Under the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, 1305, 3105, 3344, 6362, 7521 (1988), agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or if it fails to meet statutory, procedural, or constitutional requirements. *Id.* § 706(2)(A)—(D); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). This standard of review is "highly deferential," *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983), and the agency's decision is presumed to be valid. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823; *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.1976) (en banc).

■ Despite the deference accorded to the agency, the "arbitrary and capricious" standard requires that the court "immerse" itself in the evidence in the record, *Ethyl Corp.*, 541 F.2d at 36, and conduct a "thorough, probing, and in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. To be upheld, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). The court will find an agency action to be arbitrary if

> the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that was counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43, 103 S.Ct. at 2867.

■ Thus, where the agency has avoided these pitfalls, its decision is to be accorded deference. The court is not to act as a "superagency," substituting its judgment for that of the agency expert decisionmaker, but must affirm decisions it may disagree with as long as the agency has acted within the law. *Ethyl Corp.*, 541 F.2d at 36; *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *Bowman Transp. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d

---

**12.** *Eagle Found., Inc. v. Dole*, 813 F.2d 798 (7th Cir.1987), a case factually analogous to the one at bar, supports the Court's resolution of this issue. In *Eagle Foundation*, a private citizens group filed an action to permanently enjoin construction of a federally-funded highway through a historic site. In the course of a prior lawsuit, a lawyer representing the Secretary of Transportation stated that the Department would avoid constructing the highway so as to destroy the site. Despite the Department's representations, the district court enjoined construction. The government then re-studied potential routes for the highway and found that the other possibilities were dangerous to drivers. Contradicting her earlier position, the Secretary decided to construct the road through the historic site. In the subsequent litigation, the citizens group argued that the Secretary was estopped from abandoning her position in the previous proceeding. The court refused to apply judicial estoppel, stating first, that the government had not prevailed in the prior action—the district court enjoined the highway construction—and second, that the government had presented adequate reasons for its change of mind.

447 (1974); *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24; *see also American Petroleum Inst. v. EPA*, 661 F.2d 340, 349 (5th Cir. Unit A 1981) ("agency's decision need not be ideal or even, perhaps, correct ...").

In the case at hand, the plaintiffs contend that the EPA's action under section 404(c) is arbitrary and capricious for several reasons. First, they assert that the action violates stated Agency policy. Next, they claim that the EPA's action is inconsistent with its other actions in similar situations. Last, the plaintiffs contend that the decision lacks sufficient support in the administrative record. The Court will consider each of these contentions in turn.

**A. Violation of Agency Policy and Precedent**

**1. *EPA Policy***

Before delving into the specifics of this case, an overview of the relevant statutory and regulatory framework is necessary. Congress passed the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, in 1948. 33 U.S.C. §§ 1251–1325, 1341–1345, 1361–1376 (1988) ("CWA" or "the Act"). The Act's objective is lofty—"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)—and its provisions set forth a comprehensive program for controlling and abating water pollution. *Train v. City of New York*, 420 U.S. 35, 37, 95 S.Ct. 839, 841, 43 L.Ed.2d 1 (1975). Congress delegated responsibility for administering the Act to the EPA. 33 U.S.C. § 1251(d). As part of the plan, Congress included a permit program in the statute to regulate those who wished to discharge "pollutants" into "navigable waters." [13] Under section

404(a) and (b) of the Act, 33 U.S.C. § 1344(a) and (b), the Secretary of the Army can issue, subject to guidelines established by the EPA, permits for the discharge of dredged or fill materials.[14] The EPA, however, retains authority to prohibit such discharge "whenever [the Administrator] determines ... that [the] discharge ... will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or public recreational areas." 33 U.S.C. § 1344(c).[15]

Pursuant to its statutory authority, the EPA established procedures to be used when it contemplates action under section 404(c). The preamble to the EPA's proposed rule states the following:

> The section 404(c) authority may be exercised before a permit is applied for, while an application is pending, or after a permit has been issued.... It is expected that this provision will be used infrequently, since it is EPA's policy to try and resolve environmental problems before permits are issued.

44 Fed.Reg. 14,578—14,579 (1979). Later, in discussing the comments to its rule, the EPA explained:

> [The] EPA feels an important distinction should be drawn between the Agency's right to use 404(c) after issuance and its choice to do so. The statute on its face clearly allows EPA to act after the Corps has issued a permit; it refers twice to the "withdrawal of specification," which clearly refers to action by EPA after the Corps has specified a site (e.g. issued a permit or authorized its own work). On the other hand, EPA recognizes that where possible it is much preferable to exercise this authority before the Corps

---

**13.** As defined in the statute, "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. 33 U.S.C. § 1362(6). The term "navigable waters" means the waters of the United States, including the territorial seas. *Id.* § 1362(7).

**14.** *See supra* note 2 for the language of the provision.

**15.** Section 404(b)(1) guidelines, established by the EPA and set forth in 40 C.F.R. § 230, provide substantive criteria by which the acceptability of a proposed discharge is to be judged. *See* 40 C.F.R. § 231.2(e) (1989).

or state has issued a permit, and before the permit holder has begun operations. 44 Fed.Reg. 58,077 (1979). The Agency further stated:

> Nonetheless, one can anticipate that there will be circumstances where it may be necessary to act after issuance in order to carry out EPA's responsibilities under the Clean Water Act.... The regulations do not restrict EPA's right to act after a permit has been issued.... EPA agrees with the suggestion that it would be inappropriate to use 404(c) after issuance of a permit where the matters at issue were reviewed by EPA without objections during the permit proceeding, or where the matters at issue were resolved to EPA's satisfaction during the permit proceeding, unless substantial new information is first brought to the Agency's attention after issuance.

*Id.*

The plaintiffs allege that the Agency's action regarding Lake Alma violates the above-quoted policy. Pointing to the 1981 letter written by then Administrator Gorsuch in which the Agency declined to request elevated review of the lake permit, they argue that use of section 404(c) after issuance was inappropriate because the EPA's concerns were satisfied during the permit proceeding. Further, the EPA has not received new information since the permit issuance to justify its decision, the plaintiffs contend, and did not rely upon such information when acting to restrict specification of the Lake Alma site. Last, the plaintiffs suggest that the actual reason for the EPA's action is the longstanding bias of Agency officials, specifically, Acting Administrator for Water Rebecca Hanmer, against the lake project.

The EPA, of course, vigorously disputes each of the plaintiffs' contentions. The Agency argues that the stated policy is inapplicable to the Lake Alma situation because the Eleventh Circuit invalidated the issuance of the 1981 permit in its 1983 decision. Moreover, the Agency contends, even if the permit had been validly issued, the EPA policy expressly states that the Agency retains the right, accorded to it by Congress, to initiate section 404(c) proceedings at *any* time. Last, the EPA refutes the plaintiffs' claim that Agency officials were biased against the project and that this alleged bias played any role in its section 404(c) decision.

### a. EPA's Construction of its Policy Statement.

Much of the dispute concerning the applicability of EPA policy focuses upon the scope and effect of the Eleventh Circuit's opinion in *National Wildlife Federation v. Marsh*, 721 F.2d 767 (11th Cir.1983). In *Marsh*, the appellate court held that the issuance of the 1981 permit was unlawful because the Corps had not prepared a SEIS concerning the environmental impacts of the mitigation plan and had not determined the necessity of GTR permits before issuance of the lake permit. *Id.* at 784–86. Accordingly, the court invalidated the permit issuance and enjoined construction of the lake.

Given the Eleventh Circuit's holding that the permit was unlawfully issued, the plaintiffs' argument that the EPA's action under section 404(c) is a violation of policy is unavailing. First, the EPA policy explicitly states that the Agency has the authority to initiate proceedings at any time, including after a permit has been issued. This policy is consistent with the CWA which grants the Agency the power to act "whenever" it determines that a discharge will have unacceptable adverse effects. *See* 33 U.S.C. § 1344(c); 44 Fed.Reg. 14,578 and 58,077. The Court must be deferential to the Agency's construction of a statute it is entrusted to administer if the construction is reasonable and does not conflict with congressional intent. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron, Inc. v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Southern Motor Carriers Rate Conf. v. United States*, 773 F.2d 1561, 1567 (11th Cir.1985).[16] Here,

---

**16.** Not only is a reviewing court "required to defer to any reasonable EPA construction of its

the EPA's regulations permitting section 404(c) action after permit issuance, and its action pursuant to them, are consistent with the intent of Congress expressed in the CWA.

Moreover, the EPA construes its policy, cited by the plaintiffs as prohibiting the Agency's section 404(c) action [17], to be inapplicable here. As noted above, the EPA stated, in the preamble to its regulations, that it would avoid initiating section 404(c) proceedings after a permit has been issued. According to the Agency, the phrase "after a permit has been issued" means "after a permit has been *validly* issued." Thus, because the Eleventh Circuit found the issuance of the Lake Alma permit to be unlawful, the EPA interprets this policy to be inapplicable in this situation.

■■■ An agency's construction of its own *regulations* is entitled to heightened deference if the interpretation is reasonable, regardless of whether the court would have arrived at the same interpretation independently. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Avoyelles Sportsmen's League*, 715 F.2d at 910 n. 27. The agency's construction may be discounted "only if clearly unreasonable," *Kahlenberg v. INS*, 763 F.2d 1346, 1349 (1985), *vacated on other grounds*, 796 F.2d 1327 (11th Cir.1986), or "if plainly erroneous or inconsistent with the language and purposes of the regulation." *Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir.1986) (en banc) (citing *United States v. Larionoff,*

431 U.S. 864, 872, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977)). In this case, the EPA's construction of its regulatory policy is not "clearly unreasonable" or "plainly erroneous." Nor is it "inconsistent with the language and purposes of the regulation." Accordingly, the Court must defer to it. This finding is supported by the fact that the Agency initiated section 404(c) proceedings before construction of Lake Alma had begun.[18]

#### b. Alleged Bias of an Agency Official

■■■ As for the plaintiffs' contention that the alleged bias of the EPA Administrator for Water Rebecca Hanmer against the Lake Alma project was the actual reason for the Agency's action, this issue merits little discussion. Agency officials are presumed to conscientiously review the matters that come before them, particularly when the agency makes a considered decision upon a full administrative record. *Organized Fishermen v. Watt*, 590 F.Supp. 805, 811 (S.D.Fla.1984), *aff'd*, 775 F.2d 1544 (11th Cir.1985); *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C.Cir.1978). Courts generally will not "probe the mental processes" of administrators; those challenging agency action must make a "strong showing" of bad faith or improper behavior before the court will undertake such an inquiry. *Hercules*, 598 F.2d at 123; *Feller v. Board of Educ.*, 583 F.Supp. 1526, 1528 (D.Conn.1984) (citations omitted). Further, familiarity with the facts of a case, gained by an agency when performing its statutory role, does not disqualify the agency decisionmaker on the ground of predisposi-

---

enabling statutes," but even greater deference is in order when a court is reviewing the Agency's interpretations of its own regulations. *Texas Mun. Power Agency v. Administrator of EPA,* 836 F.2d 1482, 1488 (5th Cir.1988) (citing *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965)); *see also Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 910 n. 27 (5th Cir.1983); *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 746 F.2d 1492, 1499 (D.C.Cir.1984).

17. The policy referred to by the plaintiffs provides that the use of section 404(c) after issuance of a *permit, where the matters concerning the Agency were resolved to its satisfaction*

during the permit proceeding, would be inappropriate unless substantial new information is first brought to the EPA's attention after permit issuance. 44 Fed.Reg. 58,077 (1979).

18. In their arguments concerning the Agency's alleged violation of policy, the plaintiffs contend that the section 404(c) action was improper because EPA officials had not received substantial new information and had had their concerns about the lake resolved before the permit issuance in 1981. Given the Court's determination that the Agency policy at issue is inapplicable to the Alma project, the Court need not address these contentions.

tion. *Hortonville Joint School Dist. v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976); *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975); *FTC v. Cement Inst.,* 333 U.S. 683, 700–03, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). Moreover, the agency official is not deemed unfit to perform her statutory duty merely because she previously has taken a position on issues related to the case before her, even if she has expressed her opinion publicly. *Hortonville,* 426 U.S. at 493, 96 S.Ct. at 2314; *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941).

▮ In the case at hand, the plaintiffs point to two instances when Ms. Hanmer expressed her opposition to the Lake Alma project—in 1980 in a letter to the Corps and in 1986 in a memorandum to the EPA Administrator. As the above discussion of the relevant caselaw indicates, the plaintiffs must make a strong showing of improper behavior or bad faith to rebut the presumption of conscientious review on the part of Ms. Hanmer and the Agency. The evidence presented here is woefully insufficient to meet this burden.

### 2. EPA Precedent

The plaintiffs also contend that the EPA's section 404(c) action is arbitrary because it is inconsistent with previous decisions on the part of the Agency respecting this project and one other. Specifically, the plaintiffs refer to the Agency's 1981 decision not to seek further Corps review of the Lake Alma permit, and the Agency's determination not to initiate section 404(c) proceedings regarding Lake Frank Jackson, an Alabama project similar to Lake Alma. The Court determines, however, that these alleged inconsistencies do not render the EPA's action arbitrary.

▮ As the Fifth Circuit stated in *American Petroleum Institute v. EPA,* 661 F.2d 340, 355 (5th Cir. Unit A 1981), "Nothing in the [Administrative Procedure Act] prohibits the agency from changing its mind, if that change aids it in its appointed task." *Accord Moon v. Secretary of Labor,* 747 F.2d 599, 604 (11th Cir.1984); *Illinois Bell Tel. Co. v. FCC,* 740 F.2d 465, 470 (7th Cir.1984) ("there is no principle that enjoins perfect consistency" on the part of an agency) (citations omitted). An agency is not forever bound by its prior determinations, as its view of what is in the public interest may change, even if the circumstances do not. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 57, 103 S.Ct. 2856, 2873–74, 77 L.Ed.2d 443 (1983); *McHenry v. Bond,* 668 F.2d 1185, 1192 (11th Cir.1982); *Orleans Audubon Soc'y v. Lee,* 742 F.2d 901, 907 (5th Cir.1984); *Creppel v. United States Army Corps of Eng'rs,* 670 F.2d 564, 571 (5th Cir.1982); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970).[19] If the agency gives a reasoned explanation for its altered stance or departure from precedent, one which explains "why the new [position] effectuates the [relevant] statute as well or better than the old," the court should uphold the agency's decision. *New York Council Ass'n of Civ. Technicians v. Federal Labor Relations Auth.,* 757 F.2d 502, 508 (2d Cir.1985) (citations omitted); *see State Farm,* 463 U.S. at 57, 103 S.Ct. at 2873–74; *McHenry,* 668 F.2d at 1192; *Greater Boston Television,* 444 F.2d at 852.

▮ The EPA concedes that its position concerning Lake Alma has changed since former Administrator Gorsuch waived her right to further Corps review of the project in 1981. The Agency argues, however, that this reversal does not make its section 404(c) action arbitrary because, as the Eleventh Circuit noted in *Marsh,* the EPA had not focused upon the degree of mitigation provided by the Alma plan before the 1983 litigation. 721 F.2d at 782. The appellate court's invalidation of the lake permit gave

---

**19.** Even if a change in agency position coincides with a change in agency leadership, the court should not depart from its traditional, deferential standard of review. *Orleans Audubon Soc'y,* 742 F.2d at 907; *cf. Organized Fishermen v. Watt,* 590 F.Supp. 805, 811 (S.D.Fla.1984) (agency officials credited with conscientious review of issues), *aff'd,* 775 F.2d 1544 (11th Cir. 1985).

the Agency the opportunity to re-evaluate the adequacy of the mitigation plan, and the EPA accordingly determined that the plan did not sufficiently compensate for wildlife and habitat losses and concluded that the project was not in the public interest. These reasons sufficiently explain the EPA's change of position, and the Court will not overturn the Agency's action on this basis. *See American Petroleum Inst.*, 661 F.2d at 354–55 (EPA's determination that a reclassification of oil and gas wells under the CWA would benefit the environment, although the change represented a reversal of its prior position, was within the Agency's discretion and not arbitrary).

 In addition, the Agency's section 404(c) action is not rendered arbitrary by its decision to allow the construction of Lake Frank Jackson. When an agency is alleged to have departed from prior precedent or decisions, it must either distinguish or rationally explain its departure. *Acadian Gas Pipeline Sys. v. FERC*, 878 F.2d 865, 868 (5th Cir.1989); *State of Texas v. United States*, 866 F.2d 1546, 1556–57 (5th Cir.1989); *Professional Airways Sys. Specialists v. Federal Labor Relations Auth.*, 809 F.2d 855, 860 (D.C.Cir.1987). Here, although the EPA admits that the two projects are functionally similar, it emphasizes that they have some fundamental differences which justify differential treatment. First, Lake Jackson would have inundated only one-half to two-thirds the amount of wooded swamp as Lake Alma. Second, the Alabama project provided for 7,000 acres of mitigation designed to replace the same type of habitat flooded during the creation of the lake. In contrast, the Lake Alma plan called for only 194 acres of mitigation managed primarily for one type of species already plentiful in the project area and for the enhancement of 714 acres with a habitat of a different type than the one destroyed. The Court finds that these reasons are sufficient explanation for the Agency's different treatment of the two projects.

Moreover, the CWA grants the EPA wide discretion to employ section 404(c) as it deems appropriate. *See* 33 U.S.C. § 1344(c). As the Agency noted in the administrative record, its decision to initiate proceedings under this section requires a fact-specific inquiry and evaluation of factors unique to the specific project in question. Despite the certain basic similarities between Lake Frank Jackson and Lake Alma, the EPA has distinguished satisfactorily its decision in the present matter from that concerning the Alabama project.

### B. Sufficiency of the Record

 The plaintiffs' final contention is that the EPA's decision to prohibit the construction of Lake Alma under section 404(c), based on the project's "unacceptable adverse effect" on wildlife, is not supported by the administrative record. As discussed previously, the Court must search the record thoroughly to determine if the evidence contained therein supports the Agency's action. *Avoyelles Sportsmen's League*, 715 F.2d at 904–05; *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.1976) (en banc). Although the review is substantial, its only purpose is to determine whether the Agency considered relevant factors and articulated a satisfactory explanation for its decision. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866; *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *Bowman Transp. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Organized Fishermen v. Hodel*, 775 F.2d 1544, 1550 (11th Cir.1985). The Court may not second guess the EPA's finding if it is plausible and consistent with the evidence, even if the evidence is strong on both sides and reasonable minds could differ as to the right result. *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866–67; *Baltimore Gas*, 462 U.S. at 105, 103 S.Ct. at 2256; B. Schwartz, *Administrative Law* § 10.9, at 602 (1984).

 In its Final Determination, the EPA restricted the discharge of dredged or fill material, for the purpose of creating a reservoir, lake, or impoundment, at the proposed Lake Alma site. The Agency found that the project would result in the destruc-

tion and loss of vegetated wetland habitat in the Hurricane Creek bottomland hardwood wetland system and would adversely affect the ability of the forested wetland floodplain to act as a travel corridor for the movement and migration of wildlife. Thus, according to the Agency, the project would have an unacceptable adverse effect[20] on wildlife under section 404(c) and the relevant EPA guidelines. 40 C.F.R. § 230.[21]

The plaintiffs contend that the EPA's finding of unacceptable adverse effects has insufficient support in the record for several reasons. First, they emphasize that most other agencies involved with the project, specifically, the FWS, the Corps, and the DNR, have approved or withdrawn their objections to Lake Alma. The EPA's solitary[22] opposition to the project is allegedly arbitrary and ignores the views of these other agencies. Second, the plaintiffs allege that the EPA relied on speculative and unreliable information in making its decision. Finally, according to the plaintiffs, the EPA based its section 404(c) decision on factors other than the project's potential effects on wildlife. The Agency's reliance on factors such as the loss of wetlands and the degradation of water quality, the plaintiffs claim, is impermissible under the statute.

### 1. *Disagreement with Other Agencies*

The EPA acknowledges that other federal and state agencies support the Lake Alma project but denies that this divergence of opinion suggests that its decision is arbitrary. The FWS initially objected to Lake Alma as environmentally unsound, but later formulated a mitigation plan for the project and agreed to withdraw its objections if the plan were implemented. In its comments, submitted during the public hearing on the EPA's proposed action under section 404(c), the FWS described the mitigation plan as providing the "minimum acceptable level of compensation for wildlife habitat losses" resulting from the construction of the lake.

The Corps also approved the project. Although claiming that the importance of the wetlands at issue had been exaggerated by the EPA, the Corps acknowledged that the project would have some adverse effects on wildlife. It concluded, however, that there was "a great need" for the lake and accepted the judgment of the FWS that the mitigation plan provided adequate compensation for wildlife and habitat losses.

The DNR has been the most steadfast and vigorous agency supporter of Lake Alma. Stating that Hurricane Creek is not a diverse or unique habitat in Bacon County, the DNR regards the project and its mitigation as in the public interest and consistent with other DNR programs, such as the construction of waterfowl impoundments, the provision of public fishing lakes, and the distribution of wood duck boxes statewide. Dismissing the loss of wetlands as "regionally insignificant," the DNR claims that the new type of habitat created by the lake will be more "stable" than that

---

**20.** Under 40 C.F.R. § 231.2(e), an "unacceptable adverse effect" is:

[I]mpact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or groundwater) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreational areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines. *Id.* Certain pertinent sections of the EPA guidelines are set forth in the Appendix to this Order.

**21.** The plaintiffs argue that the EPA should be able to evaluate the effects of the proposed mitigation plan only, rather than the impact of the overall project, because the permit for the lake itself is "extant" and approved by the Agen-

cy. Accordingly, the plaintiffs contend that, to be upheld, the EPA must show that the mitigation itself would have an unacceptable adverse effect on wildlife. Given the Court's determination that the EPA is not barred, by judicial estoppel or its own policy and practice, from re-evaluating the environmental acceptability of the overall project, it need not address the issue whether the mitigation plan in isolation has unacceptable adverse effects on wildlife.

**22.** Actually, the EPA is not the only agency to consistently oppose the lake. The CEQ also has voiced its continued opposition to the project throughout the permit process. *See* Letter to HUD, dated July 22, 1974; Letter to mayor of Alma, dated June 10, 1977; Letter to Office of Federal Activities, EPA, dated November 15, 1979.

currently existing in the Hurricane Creek area.[23]

The EPA has addressed the positions of each of the above-named agencies in the administrative record. Pointing to the FWS Mitigation Study, the EPA refutes that agency's assertion that the plan provides adequate compensation. According to the study, an estimated 7,246 acres of wooded swamp, intensively managed, would be required to fully compensate for the total estimated net wildlife loss incurred as a result of the project. The proposed plan calls for only 194 acres of mitigation and the enhancement of 714 acres of upland habitat—a different type of habitat than the one destroyed by the construction of the lake.[24] Moreover, implementation of the proposed plan would compensate for only 13% of the wetland habitat lost and 26% of the total habitat lost[25]—a degree of compensation deemed inadequate by the EPA.[26]

The EPA also disputes the Corps' characterization of the project site as unimportant. In support of its position, the EPA refers to the Corps' 1978 Field Investigation Report, written by a team of experts dispatched to the Lake Alma site to evaluate the wetland habitat. After studying the vegetation, soil, and water quality at the project site, the team found the Hurricane Creek area to be a productive habitat with special significance because it provides a "vegetated corridor in which wildlife may feed, reproduce, and take refuge." The team noted that the site's use as a corridor was accentuated by its location— the surrounding area was urban, agri-cultural, or pine plantation and provided little to poor wildlife habitat. After conducting on-site observations and a review of the literature, the team rated the carrying capacity of the Hurricane Creek bay and branch habitat area as fair to good for all amphibians and reptiles, good to excellent for most species of mammals, and fair to good for most bird species. The report stressed the importance of amphibians and reptiles as significant links in the creek-swamp ecosystem food chain. In summary, the team stated the following:

> Water level fluctuation and the diversity of habitat provided in the creek swamp environment is conducive to producing stable aquatic and detrital food chains capable of supporting various species of game and fish. These hardwood creek-swamps provide corridors along which various animals may migrate to repopulate decimated areas. The nutrients and water supplied to adjoining rivers by the creek-swamp are eventually delivered to marine bays and estuaries and are very significant as they may affect productivity of commercial and sport fisheries.

1978 Corps Field Investigation Report, Administrative Record, Box 2, item B, vol. 4 draft SEIS, at E–113. According to the Field Investigation Report, construction of the lake would destroy 1,350 acres of habitat, 85% of which is the bay and branch habitat analyzed above.

Other portions of the administrative record also support the EPA's determination that the site area is a valuable wildlife habitat which would be adversely affected

---

**23.** In this regard, the DNR points to the assessment of the project site by biologist Richard Macomber who labeled the area a "biological desert." Plaintiffs' Exhibit 5, Report of Corps District Engineer, dated February 28, 1978.

**24.** In contrast, the Lake Frank Jackson project, functionally similar to Lake Alma, provided for 7,000 acres of managed mitigation which was designed to replace the type of habitat lost.

**25.** According to the FWS Study, construction of the lake without any mitigation would result in a loss of 36,347 habitat units. With mitigation, the number of habitat units lost is 26,735, a total offset of 26%.

**26.** In addition to the EPA, the CEQ also found the FWS mitigation plan unacceptable. In its analysis of the proposed mitigation, the CEQ stated that the plan failed to compensate for the destruction of wetlands, failed to provide appropriate mitigation for the loss of aquatic life associated with the elimination of wetland vegetation, caused the destruction of 200 additional acres of wetlands, beyond that lost as a result of the lake alone, to provide habitat for a few game species, and provided procedures to benefit one species primarily, namely, waterfowl. The CEQ also suggested that the Corps had "uncritically and erroneously" relied on the FWS plan without extensively evaluating its actual merit.

by the construction of Lake Alma. In 1978, the Game and Fish Division of the DNR stated the following:

In discussing browse for deer, the most important species are gallberry, blackgum, blackberry, black and white titi, oaks of various species, red bay, greenbrier, sweet bay and red maple. These plants occur in relative abundance and are found in one or more habitat types on the project area.... There is a rich diversity of bird life on the area, both resident and migratory. The wetter areas have an abundance of songbirds as well as wading birds.... The project area does not differ markedly from sites that can be located in Bacon and surrounding counties. However, the bottomland habitat on the area is important to wildlife for food, cover and reproductive processes.

Corps Permit Record, Administrative Record, Box 1, file 7, no. 1, at 43.

The Corps noted in its 1979 Environmental Assessment of the Lake Alma site that the project would have a "significant impact" on wildlife and conservation values. Observing that the existing wetlands provide a source of food, shelter, nesting and resting areas, and a travel lane, the Corps stated that construction of the lake would directly and adversely affect the wildlife in the area. The Corps also recognized that the project would have indirect effects on wildlife by preventing the flow of detritus, or debris, downstream. Leaf litter on the floor of the wetlands is broken down by fungi and microscopic animals and is washed into the creek. This detritus, and the creatures that eat it, become the lower end of the food chain for Hurricane Creek and connecting bodies of water. The dam constructed for Lake Alma would prevent or limit the flow of detritus by slowing the movement of the water, allowing settling of the particulates.

In the draft SEIS, the impacts of Lake Alma were described in clear terms:

[P]roject implementation would directly affect approximately 95 percent of the amphibian, 64 percent of the reptile, 56 percent of the bird, and 73 percent of the mammal species which possibly occur in the study area. The loss of 1,400 acres of bay and branch swamp communities will also remove habitat that may be utilized by several endangered animal species which could conceivably occur in the study area.... For aquatic and semi-aquatic reptiles and amphibians, a major long-term adverse impact from the project is a change from a free-flowing creek to a lake situation, with resulting changes in water depth, speed, turbidity, quality, vegetation, and bottom type. Hardwood corridors, such as that found in the bay swamp habitat of the study area, provide travel lanes for wildlife in southeastern Georgia, particularly in agricultural areas.... The relatively long length of the reservoir, approximately six miles, and the development associated with the project will interrupt the travel route afforded by Hurricane Creek to some species of wildlife in the area.

Administrative Record, Box 2, item B., vol. IV, at 15. As to the permanent, unavoidable impacts of the project, the SEIS concluded:

Approximately 1,400 acres of bay and branch swamp habitat which probably supports the greatest diversity of wildlife in the study area, would be eliminated by the impoundment of the proposed lake. This action would cause a permanent elimination of terrestrial organisms from the lake site. Some reptiles, amphibians, mammals, and possibly some birds (nests and nestlings) will be lost during the initial construction and impoundment phases of the lake. Movement of displaced species into adjacent environments surrounding the lake may cause stresses on animal populations through competition for food, cover, and breeding habitats and territories, if animal populations are already at the carrying capacity for these habitats. The bay and branch swamp community in the study area appears to be habitat for the American alligator, and conceivably seven other endangered species. The princi-

pal adverse impact on this species is the removal of potential habitat.[27]

*Id.* vol. VII at 1 & vol. VIII at 1.

The DNR, in its comments on the proposed section 404(c) action, raised several objections to the EPA's position. Far from ignoring the DNR's contentions, the EPA addressed each individually in its Final Determination. About the statement that the project site provides little wildlife habitat due to the size of the trees and the type of mast (i.e., nuts) produced, the EPA states that the DNR's conclusion is not based on current information, does not reflect food requirements for wildlife species that do not consume hard mast, and ignores the other wildlife values provided by the vegetation on the project site (presumably coverage and nesting areas, among others). Regarding the DNR's contention that construction of the lake would increase the ability of the site area to support a recreational fishery, the EPA admits that the project would increase the game fish and game bird population in the area. The EPA points out, however, that this increase would come at the expense of other indigenous wildlife species, and the loss would not be offset by the proposed mitigation. Finally, the DNR asserts that the lake would improve the migratory corridor for waterfowl and provide an excellent wintering habitat. Although acknowledging that certain species of waterfowl would benefit from the project, the EPA notes that the present site already provides a substantial habitat for waterfowl, and reiterates the loss of other species which would result from the lake.

In its comments included in the draft SEIS, the DNR recognized that whether "unacceptable adverse impacts" exist is subject to professional judgment, which may vary. Although the judgment of the EPA diverges from that of the DNR and others in this case, that difference does not render the EPA's action arbitrary. As the above discussion makes clear, the EPA's decision is bolstered by substantial evidence. Thus, the Court will not overturn such a decision simply because other agencies have disagreed with it.

### 2. *Quality of Information Used by the EPA*

■ In addition, neither of the plaintiffs' other contentions justify a reversal of the Agency. The plaintiffs first argue that the EPA relied on speculative information in determining the species which inhabit the project area. The Agency maintains, however, that its methodology is sound. In making its evaluation, the EPA compiled lists of species, reasonably expected to be seen on the site, which represent wildlife evaluations and on-site surveys conducted by several federal and state agencies. These lists are based on scientific knowledge of species range and habitat, and their use is an accepted practice among all federal agencies conducting environmental assessments. Although the plaintiffs vigorously criticize the EPA's practice, they do not dispute that the use of these lists is standardized procedure. Accordingly, the Court finds that the Agency's reliance on these lists is not arbitrary.

### 3. *Proper Scope of EPA's Focus*

■ The plaintiffs' final assertion—that the EPA's section 404(c) action is unlawful

---

27. Other documents in the administrative record also lend support for the EPA's action. The CEQ, in letters to city officials and other agencies, described the project site as a "highly productive wetland area with well-developed, diverse vegetation." Administrative Record, Box 1, file 4, no. 50. The CEQ also noted that conservation groups indicate that the wildlife impacts as a result of the project would be more extensive than estimated in the EIS. *Id.* no. 58. In a letter written to the Corps before the formulation of the mitigation plan, the FWS recounted the importance of the Hurricane Creek wetland area by stating that the habitat is ex-

tremely important in the maintenance of high fish and wildlife values. According to the FWS, the standing crop of fish in the reservoir that would be created, after the initial years, is expected to be low. *Id.* no. 60. Tom Welborn, an EPA biologist, evaluated the project site and rated the area as an "above average" wildlife habitat compared to other wetlands in the Southeast. His report states that the Hurricane Creek floodplain has diverse and palatable vegetation, good area for cover, and an abundance and variety of wildlife habitat. Administrative Record, Box 4, file 3, no. 13.

because the Agency considered factors other than the effects on wildlife when evaluating Lake Alma—also lacks merit. First, section 404(b)(1) guidelines, the criteria used to determine the acceptability of a proposed discharge, authorize consideration of certain "non-wildlife" factors, such as water quality and the loss of wetlands.[28] *See* 40 C.F.R. §§ 230.10(c) & 230.41. Moreover, as the EPA notes, these factors are related to the determination of "unacceptable adverse effects" on wildlife as they directly bear on the viability and quality of wildlife habitat. In addition, although the EPA may have voiced its concerns about the project's effects on water quality and the destruction of wetlands, the record supports the Agency's judgment that the project adversely affects wildlife. Consequently, the Court must uphold the EPA's action.

## CONCLUSION

As noted at the outset of this Order, this case has been of extraordinary duration. The plaintiffs have withstood numerous bureaucratic hardships and over ten years of litigation in their struggle to build Lake Alma. The Court is sympathetic to their plight and admires their perseverance; nevertheless, it must abide by the law. After an exhaustive review of the administrative record, relevant statutes, regulations, and precedent, the Court has determined that the EPA acted within the scope of the CWA and the Administrative Procedure Act. Accordingly, the Court orders the following:

1. That the plaintiff's motion for consolidation, under Federal Rule of Civil Procedure 42(a), of *City of Alma, et al. v. United States, et al.*, CV589–51, and *National Wildlife Federation, et al. v. Marsh, et al.*, CV582–98, is GRANTED;

2. That the plaintiffs' motion for lifting of the injunction, imposed by this Court on March 28, 1986, is DENIED;

3. That the plaintiffs' motion for summary judgment is DENIED; and

4. That the defendants' motion for summary judgment is GRANTED.

SO ORDERED.[29]

---

**28.** 40 C.F.R. § 231.2(e) defines "unacceptable adverse effect" and requires that the EPA consider the relevant section 404(b)(1) guidelines when evaluating the unacceptability of such impacts under section 404(c). *See Bersani v. EPA*, 674 F.Supp. 405, 414–17 (N.D.N.Y.1987), *aff'd*, 850 F.2d 36 (2d Cir.1988) (recognizing that the EPA can consider the section 404(b)(1) guidelines when acting under section 404(c)).

**29.** The Court feels that the result reached here is compelled by law. As a native of this area, however, I understand the desire of the community leaders to construct Lake Alma, and I concur with their view. A principled undertaking, motivated by the city's yearning for economic betterment, has been thwarted. Time and the tenacious opposition, largely of non-local persons and federal officials, prevented the project. Although the "environmentalist" may cheer this decision, the citizens of Alma may have great difficulty understanding the maneuverings of administrative agencies and the dissertations of the courts.

wrecks or no closer than 22 kilometers (12 miles) from the nearest land and in water no less than 50 fathoms (300 feet) deep, and all necessary measures shall be taken to insure that the vessels sink to the bottom rapidly and that marine navigation is not otherwise impaired.

(6) Disposal shall not take place in established shipping lanes unless at a designated wreck site, nor in a designated marine sanctuary, nor in a location where the hulk may present a hazard to commercial trawling or national defense (see 33 CFR Part 205).

(7) Except in emergency situations, as determined by the U.S. Army Corps of Engineers and/or the U.S. Coast Guard, disposal of these vessels shall be performed during daylight hours only.

(8) Except in emergency situations, as determined by the U.S. Army Corps of Engineers and/or the District Commander of the U.S. Coast Guard, the Captain-of-the-Port (COTP), U.S. Coast Guard, and the EPA Regional Administrator shall be notified forty-eight (48) hours in advance of the proposed disposal. In addition, the COTP and the EPA Regional Administrator shall be notified by telephone at least twelve (12) hours in advance of the vessel's departure from port with such details as the proposed departure time and place, disposal site location, estimated time of arrival on site, and the name and communication capability of the towing vessel. Schedule changes are to be reported to the COTP as rapidly as possible.

(9) The National Ocean Survey, NOAA, 6010 Executive Blvd., Rockville, MD 20852, shall be notified in writing, within 1 week, of the exact coordinates of the disposal site so that it may be marked on appropriate charts.

## PART 230—SECTION 404(b)(1) GUIDELINES FOR SPECIFICATION OF DISPOSAL SITES FOR DREDGED OR FILL MATERIAL

### Subpart A—General

Sec.
230.1 Purpose and policy.
230.2 Applicability.
230.3 Definitions.
230.4 Organization.
230.5 General procedures to be followed.
230.6 Adaptability.
230.7 General permits.

#### Subpart B—Compliance With the Guidelines

230.10 Restrictions on discharge.
230.11 Factual determinations.
230.12 Findings of compliance or non-compliance with the restrictions on discharge.

#### Subpart C—Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem

230.20 Substrate.
230.21 Suspended particulates/turbidity.
230.22 Water.
230.23 Current patterns and water circulation.
230.24 Normal water fluctuations.
230.25 Salinity gradients.

#### Subpart D—Potential Impacts on Biological Characteristics of the Aquatic Ecosystem

230.30 Threatened and endangered species.
230.31 Fish, crustaceans, mollusks, and other aquatic organisms in the food web.
230.32 Other wildlife.

#### Subpart E—Potential Impacts on Special Aquatic Sites

230.40 Sanctuaries and refuges.
230.41 Wetlands.
230.42 Mud flats.
230.43 Vegetated shallows.
230.44 Coral reefs.
230.45 Riffle and pool complexes.

#### Subpart F—Potential Effects on Human Use Characteristics

230.50 Municipal and private water supplies.
230.51 Recreational and commercial fisheries.
230.52 Water-related recreation.
230.53 Aesthetics.
230.54 Parks, national and historical monuments, national seashores, wilderness areas, research sites and similar preserves.

#### Subpart G—Evaluation and Testing

230.60 General evaluation of dredged or fill material.
230.61 Chemical, biological, and physical evaluation and testing.

**Environmental Protection Agency** § 230.2

Sec.

#### Subpart H—Actions to Minimize Adverse Effects

230.70 Actions concerning the location of the discharge.
230.71 Actions concerning the material to be discharged.
230.72 Actions controlling the material after discharge.
230.73 Actions affecting the method of dispersion.
230.74 Actions related to technology.
230.75 Actions affecting plant and animal populations.
230.76 Actions affecting human use.
230.77 Other actions.

#### Subpart I—Planning To Shorten Permit Processing Time

230.80 Advanced identification of disposal areas.

AUTHORITY: Secs. 404(b) and 501(a) of the Clean Water Act of 1977 (33 U.S.C. 1344(b) and 1361(a)).

SOURCE: 45 FR 85344, Dec. 24, 1980, unless otherwise noted.

### Subpart A—General

§ 230.1 Purpose and policy.

(a) The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.

(b) Congress has expressed a number of policies in the Clean Water Act. These Guidelines are intended to be consistent with and to implement those policies.

(c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

(d) From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special

sites may represent an irreversible loss of valuable aquatic resources.

§ 230.2 Applicability.

(a) These Guidelines have been developed by the Administrator of the Environmental Protection Agency in conjunction with the Secretary of the Army acting through the Chief of Engineers under section 404(b)(1) of the Clean Water Act (33 U.S.C. 1344). The Guidelines are applicable to the specification of disposal sites for discharges of dredged or fill material into waters of the United States. Sites may be specified through:

(1) The regulatory program of the U.S. Army Corps of Engineers under sections 404(a) and (e) of the Act (see 33 CFR Parts 320, 323 and 325);

(2) The civil works program of the U.S. Army Corps of Engineers (see 33 CFR 209.145 and section 150 of Pub. L. 94–587, Water Resources Development Act of 1976);

(3) Permit programs of States approved by the Administrator of the Environmental Protection Agency in accordance with section 404(g) and (h) of the Act (see 40 CFR Parts 122, 123 and 124);

(4) Statewide dredged or fill material regulatory programs with best management practices approved under section 208(b)(4)(B) and (C) of the Act (see 40 CFR 35.1560);

(5) Federal construction projects which meet criteria specified in section 404(r) of the Act.

(b) These Guidelines will be applied in the review of proposed discharges of dredged or fill material into navigable waters which lie inside the baseline from which the territorial sea is measured, and the discharge of fill material into the territorial sea, pursuant to the procedures referred to in paragraphs (a)(1) and (2) of this section. The discharge of dredged material into the territorial sea is governed by the Marine Protection, Research, and Sanctuaries Act of 1972, Pub. L. 92–532, and regulations and criteria issued pursuant thereto (40 CFR Parts 220 through 228).

(c) Guidance on interpreting and implementing these Guidelines may be prepared jointly by EPA and the

Corps at the national or regional level from time to time. No modifications to the basic application, meaning, or intent of these Guidelines will be made without rulemaking by the Administrator under the Administrative Procedure Act (5 U.S.C. 551 *et seq.*).

§ 230.3 **Definitions.**

For purposes of this part, the following terms shall have the meanings indicated:

(a) The term "Act" means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92-500, as amended by Pub. L. 95-217, 33 U.S.C. 1251, *et seq.*

(b) The term "adjacent"means bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like are "adjacent wetlands."

(c) The terms "aquatic environment" and "aquatic ecosystem" mean waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals.

(d) The term "carrier of contaminant" means dredged or fill material that contains contaminants.

(e) The term "contaminant" means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants promulgated on January 31, 1978 (43 FR 4109).

(f)—(g) [Reserved]

(h) The term "discharge point" means the point within the disposal site at which the dredged or fill material is released.

(i) The term "disposal site" means that portion of the "waters of the United States" where specific disposal activities are permitted and consist of a bottom surface area and any overlying volume of water. In the case of wetlands on which surface water is not present, the disposal site consists of the wetland surface area.

(j) [Reserved]

(k) The term "extraction site" means the place from which the dredged or fill material proposed for discharge is to be removed.

(l) [Reserved]

(m) The term "mixing zone" means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a discharge point where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water. The mixing zone should be considered as a place where wastes and water mix and not as a place where effluents are treated.

(n) The term "permitting authority" means the District Engineer of the U.S. Army Corps of Engineers or such other individual as may be designated by the Secretary of the Army to issue or deny permits under section 404 of the Act; or the State Director of a permit program approved by EPA under section 404(g) and section 404(h) or his delegated representative.

(o) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by the Atomic Energy Act, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the Act reflects that "radioactive materials" as included within the definition of "pollutant" in section 502 of the Act means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term "pollutant", are radium and accelerator produced isotopes. See *Train* v. *Colorado Public Interest Research Group, Inc.,* 426 U.S. 1 (1976).

(p) The term "pollution" means the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem.

(q) The term "practicable" means available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

(q-1) "Special aquatic sites" means those sites identified in Subpart E. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region. (See § 230.10(a)(3))

(r) The term "territorial sea" means the belt of the sea measured from the baseline as determined in accordance with the Conventon on the Territorial Sea and the Contiguous Zone and extending seaward a distance of three miles.

(s) The term "waters of the United States" means:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purposes by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under this definition;

(5) Tributaries of waters identified in paragraphs (s)(1) through (4) of this section;

(6) The territorial sea;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (s)(1) through (6) of this section; waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 423.11(m) which also meet the criteria of this definition) are not waters of the United States.

(t) The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

## § 230.4 Organization.

The Guidelines are divided into eight subparts. Subpart A presents those provisions of general applicability, such as purpose and definitions. Subpart B establishes the four conditions which must be satisfied in order to make a finding that a proposed discharge of dredged or fill material complies with the Guidelines. Section 230.11 of Subpart B, sets forth factual determinations which are to be considered in determining whether or not a proposed discharge satisfies the Subpart B conditions of compliance. Subpart C describes the physical and chemical components of a site and provides guidance as to how proposed discharges of dredged or fill material may affect these components. Subparts D through F detail the special characteristics of particular aquatic ecosystems in terms of their values, and the possible loss of these values due to discharges of dredged or fill material. Subpart G prescribes a number of physical, chemical, and biological evaluations and testing procedures to be used in reaching the required factual determinations. Subpart H details the means to prevent or mimimize adverse effects. Subpart I concerns advanced identification of disposal areas.

§ 230.5 **General procedures to be followed.**

In evaluating whether a particular discharge site may be specified, the permitting authority should use these Guidelines in the following sequence:

(a) In order to obtain an overview of the principal regulatory provisions of the Guidelines, review the restrictions on discharge in § 230.10(a) through (d), the measures to minimize adverse impact of Subpart H, and the required factual determinations of § 230.11.

(b) Determine if a General permit (§ 230.7) is applicable; if so, the applicant needs merely to comply with its terms, and no further action by the permitting authority is necessary. Special conditions for evaluation of proposed General permits are contained in § 230.7. If the discharge is not covered by a General permit:

(c) Examine practicable alternatives to the proposed discharge, that is, not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences (§ 230.10(a)).

(d) Delineate the candidate disposal site consistent with the criteria and evaluations of § 230.11(f).

(e) Evaluate the various physical and chemical components which characterize the non-living environment of the candidate site, the substrate and the water including its dynamic characteristics (Subpart C).

(f) Identify and evaluate any special or critical characteristics of the candidate disposal site, and surrounding areas which might be affected by use of such site, related to their living communities or human uses (Subparts D, E, and F).

(g) Review Factual Determinations in § 230.11 to determine whether the information in the project file is sufficient to provide the documentation required by § 230.11 or to perform the pre-testing evaluation described in § 230.60, or other information is necessary.

(h) Evaluate the material to be discharged to determine the possibility of chemical contamination or physical incompatibility of the material to be discharged (§ 230.60).

(i) If there is a reasonable probability of chemical contamination, conduct the appropriate tests according to the section on Evaluation and Testing (§ 230.61).

(j) Identify appropriate and practicable changes to the project plan to minimize the environmental impact of the discharge, based upon the specialized methods of minimization of impacts in Subpart H.

(k) Make and document Factual Determinations in § 230.11.

(l) Make and document Findings of Compliance (§ 230.12) by comparing Factual Determinations with the requirements for discharge of § 230.10.

This outline of the steps to follow in using the Guidelines is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of previous steps. The permitting authority must address all of the relevant provisions of the Guidelines in reaching a Finding of Compliance in an individual case.

§ 230.6 **Adaptability.**

(a) The manner in which these Guidelines are used depends on the physical, biological, and chemical nature of the proposed extraction site, the material to be discharged, and the candidate disposal site, including any other important components of the ecosystem being evaluated. Documentation to demonstrate knowledge about the extraction site, materials to be extracted, and the candidate disposal site is an essential component of guideline application. These Guidelines allow evaluation and documentation for a variety of activities, ranging from those with large, complex impacts on the aquatic environment to those for which the impact is likely to be innocuous. It is unlikely that the Guidelines will apply in their entirety to any one activity, no matter how complex. It is anticipated that substantial numbers of permit applications will be for minor, routine activities that have little, if any, potential for significant degradation of the aquatic environment. It generally is not intended or expected that extensive testing, evaluation or analysis will be needed to make findings of compliance in such routine cases. Where the conditions for General permits are

met, and where numerous applications for similar activities are likely, the use of General permits will eliminate repetitive evaluation and documentation for individual discharges.

(b) The Guidelines user, including the agency or agencies responsible for implementing the Guidelines, must recognize the different levels of effort that should be associated with varying degrees of impact and require or prepare commensurate documentation. The level of documentation should reflect the significance and complexity of the discharge activity.

(c) An essential part of the evaluation process involves making determinations as to the relevance of any portion(s) of the Guidelines and conducting further evaluation only as needed. However, where portions of the Guidelines review procedure are "short form" evaluations, there still must be sufficient information (including consideration of both individual and cumulative impacts) to support the decision of whether to specify the site for disposal of dredged or fill material and to support the decision to curtail or abbreviate the evaluation process. The presumption against the discharge in § 230.1 applies to this decision-making.

(d) In the case of activities covered by General permits or section 208(b)(4)(B) and (C) Best Management Practices, the analysis and documentation required by the Guidelines will be performed at the time of General permit issuance or section 208(b)(4)(B) and (C) Best Management Practices promulgation and will not be repeated when activities are conducted under a General permit or section 208(b)(4)(B) and (C) Best Management Practices control. These Guidelines do not require reporting or formal written communication at the time individual activities are initiated under a General permit or section 208(b)(4)(B) and (C) Best Management Practices. However, a particular General permit may require appropriate reporting.

§ 230.7 General permits.

(a) *Conditions for the issuance of General permits.* A General permit for a category of activities involving the discharge of dredged or fill material complies with the Guidelines if it meets the applicable restrictions on the discharge in § 230.10 and if the permitting authority determines that:

(1) The activities in such category are similar in nature and similar in their impact upon water quality and the aquatic environment;

(2) The activities in such category will have only minimal adverse effects when performed separately; and

(3) The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment.

(b) *Evaluation process.* To reach the determinations required in paragraph (a) of this section, the permitting authority shall set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General permit. While some of the information necessary for this evaluation can be obtained from potential permittees and others through the proposal of General permits for public review, the evaluation must be completed before any General permit is issued, and the results must be published with the final permit.

(1) This evaluation shall be based upon consideration of the prohibitions listed in § 230.10(b) and the factors listed in § 230.10(c), and shall include documented information supporting each factual determination in § 230.11 of the Guidelines (consideration of alternatives in § 230.10(a) are not directly applicable to General permits);

(2) The evaluation shall include a precise description of the activities to be permitted under the General permit, explaining why they are sufficiently similar in nature and in environmental impact to warrant regulation under a single General permit based on Subparts C through F of the Guidelines. Allowable differences between activities which will be regulated under the same General permit shall be specified. Activities otherwise similar in nature may differ in environmental impact due to their location in or near ecologically sensitive areas, areas with unique chemical or physical characteristics, areas containing concentrations of toxic substances, or

areas regulated for specific human uses or by specific land or water management plans (e.g., areas regulated under an approved Coastal Zone Management Plan). If there are specific geographic areas within the purview of a proposed General permit (called a draft General permit under a State 404 program), which are more appropriately regulated by individual permit due to the considerations cited in this paragraph, they shall be clearly delineated in the evaluation and excluded from the permit. In addition, the permitting authority may require an individual permit for any proposed activity under a General permit where the nature or location of the activity makes an individual permit more appropriate.

(3) To predict cumulative effects, the evaluation shall include the number of individual discharge activities likely to be regulated under a General permit until its expiration, including repetitions of individual discharge activities at a single location.

## Subpart B—Compliance With the Guidelines

### § 230.10 Restrictions on discharge.

NOTE: Because other laws may apply to particular discharges and because the Corps of Engineers or State 404 agency may have additional procedural and substantive requirements, a discharge complying with the requirement of these Guidelines will not automatically receive a permit.

Although all requirements in § 230.10 must be met, the compliance evaluation procedures will vary to reflect the seriousness of the potential for adverse impacts on the aquatic ecosystems posed by specific dredged or fill material discharge activities.

(a) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters;

(2) An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

(3) Where the activity associated with a discharge which is proposed for a special aquatic site (as defined in Subpart E) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demostrated otherwise.

(4) For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents, including supplemental Corps NEPA documents, will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under this paragraph or may not have considered the alternatives in sufficient detail to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information.

(5) To the extent that practicable alternatives have been identified and

evaluated under a Coastal Zone Management program, a section 208 program, or other planning process, such evaluation shall be considered by the permitting authority as part of the consideration of alternatives under the Guidelines. Where such evaluation is less complete than that contemplated under this subsection, it must be supplemented accordingly.

(b) No discharge of dredged or fill material shall be permitted if it:

(1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard;

(2) Violates any applicable toxic effluent standard or prohibition under section 307 of the Act;

(3) Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of a habitat which is determined by the Secretary of Interior or Commerce, as appropriate, to be a critical habitat under the Endangered Species Act of 1973, as amended. If an exemption has been granted by the Endangered Species Committee, the terms of such exemption shall apply in lieu of this subparagraph;

(4) Violates any requirement imposed by the Secretary of Commerce to protect any marine sanctuary designated under Title III of the Marine Protection, Research, and Sanctuaries Act of 1972.

(c) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by Subparts B and G, after consideration of Subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts. Under these Guidelines, effects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their by-products outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

(d) Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem. Subpart H identifies such possible steps.

§ 230.11 Factual determinations.

The permitting authority shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of Subparts C through F. Such factual determinations shall be used in § 230.12 in making findings of compliance or non-compliance with the restrictions on discharge in § 230.10. The evaluation and testing procedures described in § 230.60 and § 230.61 of Subpart G shall be used as necessary to make, and shall be described in, such determination. The determinations of effects of each proposed discharge shall include the following:

(a) *Physical substrate determinations.* Determine the nature and

degree of effect that the proposed discharge will have, individually and cumulatively, on the characteristics of the substrate at the proposed disposal site. Consideration shall be given to the similarity in particle size, shape, and degree of compaction of the material proposed for discharge and the material constituting the substrate at the disposal site, and any potential changes in substrate elevation and bottom contours, including changes outside of the disposal site which may occur as a result of erosion, slumpage, or other movement of the discharged material. The duration and physical extent of substrate changes shall also be considered. The possible loss of environmental values (§ 230.20) and actions to minimize impact (Subpart H) shall also be considered in making these determinations. Potential changes in substrate elevation and bottom contours shall be predicted on the basis of the proposed method, volume, location, and rate of discharge, as well as on the individual and combined effects of current patterns, water circulation, wind and wave action, and other physical factors that may affect the movement of the discharged material.

(b) *Water circulation, fluctuation, and salinity determinations.* Determine the nature and degree of effect that the proposed discharge will have individually and cumulatively on water, current patterns, circulation including downstream flows, and normal water fluctuation. Consideration shall be given to water chemistry, salinity, clarity, color, odor, taste, dissolved gas levels, temperature, nutrients, and eutrophication plus other appropriate characteristics. Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime. Additional consideration of the possible loss of environmental values (§§ 230.23 through 230.25) and actions to minimize impacts (Subpart H), shall be used in making these determinations. Potential significant effects on the current patterns, water circulation, normal water fluctuation and salinity shall be evaluated on the basis of the

proposed method, volume, location, and rate of discharge.

(c) *Suspended particulate/turbidity determinations.* Determine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site. Consideration shall be given to the grain size of the material proposed for discharge, the shape and size of the plume of suspended particulates, the duration of the discharge and resulting plume and whether or not the potential changes will cause violations of applicable water quality standards. Consideration should also be given to the possible loss of environmental values (§ 230.21) and to actions for minimizing impacts (Subpart H). Consideration shall include the proposed method, volume, location, and rate of discharge, as well as the individual and combined effects of current patterns, water circulation and fluctuations, wind and wave action, and other physical factors on the movement of suspended particulates.

(d) *Contaminant determinations.* Determine the degree to which the material proposed for discharge will introduce, relocate, or increase contaminants. This determination shall consider the material to be discharged, the aquatic environment at the proposed disposal site, and the availability of contaminants.

(e) *Aquatic ecosystem and organism determinations.* Determine the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms. Consideration shall be given to the effect at the proposed disposal site of potential changes in substrate characteristics and elevation, water or substrate chemistry, nutrients, currents, circulation, fluctuation, and salinity, on the recolonization and existence of indigenous aquatic organisms or communities. Possible loss of environmental values (§ 230.31), and actions to minimize impacts (Subpart H) shall be examined. Tests as described in § 230.61 (Evaluation and Testing), may be required to provide

information on the effect of the discharge material on communities or populations of organisms expected to be exposed to it.

(f) *Proposed disposal site determinations.* (1) Each disposal site shall be specified through the application of these Guidelines. The mixing zone shall be confined to the smallest practicable zone within each specified disposal site that is consistent with the type of dispersion determined to be appropriate by the application of these Guidelines. In a few special cases under unique environmental conditions, where there is adequate justification to show that widespread dispersion by natural means will result in no significantly adverse environmental effects, the discharged material may be intended to be spread naturally in a very thin layer over a large area of the substrate rather than be contained within the disposal site.

(2) The permitting authority and the Regional Administrator shall consider the following factors in determining the acceptability of a proposed mixing zone:

(i) Depth of water at the disposal site;

(ii) Current velocity, direction, and variability at the disposal site;

(iii) Degree of turbulence;

(iv) Stratification attributable to causes such as obstructions, salinity or density profiles at the disposal site;

(v) Discharge vessel speed and direction, if appropriate;

(vi) Rate of discharge;

(vii) Ambient concentration of constituents of interest;

(viii) Dredged material characteristics, particularly concentrations of constituents, amount of material, type of material (sand, silt, clay, etc.) and settling velocities;

(ix) Number of discharge actions per unit of time;

(x) Other factors of the disposal site that affect the rates and patterns of mixing.

(g) *Determination of cumulative effects on the aquatic ecosystem.* (1) Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material. Although the

impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

(2) Cumulative effects attributable to the discharge of dredged or fill material in waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits.

(h) *Determination of secondary effects on the aquatic ecosystem.* (1) Secondary effects are effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.

(2) Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S. Activities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands.

§ 230.12 Findings of compliance or noncompliance with the restrictions on discharge.

(a) On the basis of these Guidelines (Subparts C through G) the proposed

disposal sites for the discharge of dredged or fill material must be:

(1) Specified as complying with the requirements of these Guidelines; or

(2) Specified as complying with the requirements of these Guidelines with the inclusion of appropriate and practicable discharge conditions (see Subpart H) to minimize pollution or adverse effects to the affected aquatic ecosystems; or

(3) Specified as failing to comply with the requirements of these Guidelines where:

(i) There is a practicable alternative to the proposed discharge that would have less adverse effect on the aquatic ecosystem, so long as such alternative does not have other significant adverse environmental consequences; or

(ii) The proposed discharge will result in significant degradation of the aquatic ecosystem under § 230.10(b) or (c); or

(iii) The proposed discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem; or

(iv) There does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines.

(b) Findings under this section shall be set forth in writing by the permitting authority for each proposed discharge and made available to the permit applicant. These findings shall include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration. In the case of a General permit, such findings shall be prepared at the time of issuance of that permit rather than for each subsequent discharge under the authority of that permit.

## Subpart C—Potential Impacts on Physical and Chemical Characteristics of the Aquatic Ecosystem

NOTE: The effects described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in Subpart B.

### § 230.20 Substrate.

(a) The substrate of the aquatic ecosystem underlies open waters of the United States and constitutes the surface of wetlands. It consists of organic and inorganic solid materials and includes water and other liquids or gases that fill the spaces between solid particles.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in varying degrees of change in the complex physical, chemical, and biological characteristics of the substrate. Discharges which alter substrate elevation or contours can result in changes in water circulation, depth, current pattern, water fluctuation and water temperature. Discharges may adversely affect bottom-dwelling organisms at the site by smothering immobile forms or forcing mobile forms to migrate. Benthic forms present prior to a discharge are unlikely to recolonize on the discharged material if it is very dissimilar from that of the discharge site. Erosion, slumping, or lateral displacement of surrounding bottom of such deposits can adversely affect areas of the substrate outside the perimeters of the disposal site by changing or destroying habitat. The bulk and composition of the discharged material and the location, method, and timing of discharges may all influence the degree of impact on the substrate.

### § 230.21 Suspended particulates/turbidity.

(a) Suspended particulates in the aquatic ecosystem consist of fine-grained mineral particles, usually smaller than silt, and organic particles. Suspended particulates may enter water bodies as a result of land runoff, flooding, vegetative and planktonic breakdown, resuspension of bottom sediments, and man's activities including dredging and filling. Particulates may remain suspended in the water column for variable periods of time as a result of such factors as agitation of the water mass, particulate specific gravity, particle shape, and physical and chemical properties of particle surfaces.

**Environmental Protection Agency** § 230.24

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can result in greatly elevated levels of suspended particulates in the water column for varying lengths of time. These new levels may reduce light penetration and lower the rate of photosynthesis and the primary productivity of an aquatic area if they last long enough. Sight-dependent species may suffer reduced feeding ability leading to limited growth and lowered resistance to disease if high levels of suspended particulates persist. The biological and the chemical content of the suspended material may react with the dissolved oxygen in the water, which can result in oxygen depletion. Toxic metals and organics, pathogens, and viruses absorbed or adsorbed to fine-grained particulates in the material may become biologically available to organisms either in the water column or on the substrate. Significant increases in suspended particulate levels create turbid plumes which are highly visible and aesthetically displeasing. The extent and persistence of these adverse impacts caused by discharges depend upon the relative increase in suspended particulates above the amount occurring naturally, the duration of the higher levels, the current patterns, water level, and fluctuations present when such discharges occur, the volume, rate, and duration of the discharge, particulate deposition, and the seasonal timing of the discharge.

§ 230.22 Water.

(a) Water is the part of the aquatic ecosystem in which organic and inorganic constituents are dissolved and suspended. It constitutes part of the liquid phase and is contained by the substrate. Water forms part of a dynamic aquatic life-supporting system. Water clarity, nutrients and chemical content, physical and biological content, dissolved gas levels, pH, and temperature contribute to its life-sustaining capabilities.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can change the chemistry and the physical characteristics of the receiving water

at a disposal site through the introduction of chemical constituents in suspended or dissolved form. Changes in the clarity, color, odor, and taste of water and the addition of contaminants can reduce or eliminate the suitability of water bodies for populations of aquatic organisms, and for human consumption, recreation, and aesthetics. The introduction of nutrients or organic material to the water column as a result of the discharge can lead to a high biochemical oxygen demand (BOD), which in turn can lead to reduced dissolved oxygen, thereby potentially affecting the survival of many aquatic organisms. Increases in nutrients can favor one group of organisms such as algae to the detriment of other more desirable types such as submerged aquatic vegetation, potentially causing adverse health effects, objectionable tastes and odors, and other problems.

§ 230.23 Current patterns and water circulation.

(a) Current patterns and water circulation are the physical movements of water in the aquatic ecosystem. Currents and circulation respond to natural forces as modified by basin shape and cover, physical and chemical characteristics of water strata and masses, and energy dissipating factors.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can modify current patterns and water circulation by obstructing flow, changing the direction or velocity of water flow, changing the direction or velocity of water flow and circulation, or otherwise changing the dimensions of a water body. As a result, adverse changes can occur in: Location, structure, and dynamics of aquatic communities; shoreline and substrate erosion and depositon rates; the deposition of suspended particulates; the rate and extent of mixing of dissolved and suspended components of the water body; and water stratification.

§ 230.24 Normal water fluctuations.

(a) Normal water fluctuations in a natural aquatic system consist of daily, seasonal, and annual tidal and

flood fluctuations in water level. Biological and physical components of such a system are either attuned to or characterized by these periodic water fluctuations.

(b) Possible loss of environmental characteristics and values: The discharge of dredged or fill material can alter the normal water-level fluctuation pattern of an area, resulting in prolonged periods of inundation, exaggerated extremes of high and low water, or a static, nonfluctuating water level. Such water level modifications may change salinity patterns, alter erosion or sedimentation rates, aggravate water temperature extremes, and upset the nutrient and dissolved oxygen balance of the aquatic ecosystem. In addition, these modifications can alter or destroy communities and populations of aquatic animals and vegetation, induce populations of nuisance organisms, modify habitat, reduce food supplies, restrict movement of aquatic fauna, destroy spawning areas, and change adjacent, upstream, and downstream areas.

### § 230.25 Salinity gradients.

(a) Salinity gradients form where salt water from the ocean meets and mixes with fresh water from land.

(b) Possible loss of environmental characteristics and values: Obstructions which divert or restrict flow of either fresh or salt water may change existing salinity gradients. For example, partial blocking of the entrance to an estuary or river mouth that significantly restricts the movement of the salt water into and out of that area can effectively lower the volume of salt water available for mixing within that estuary. The downstream migration of the salinity gradient can occur, displacing the maximum sedimentation zone and requiring salinity-dependent aquatic biota to adjust to the new conditions, move to new locations if possible, or perish. In the freshwater zone, discharge operations in the upstream regions can have equally adverse impacts. A significant reduction in the volume of fresh water moving into an estuary below that which is considered normal can affect the location and type of mixing thereby changing the characteristic salinity

patterns. The resulting changed circulation pattern can cause the upstream migration of the salinity gradient displacing the maximim sedimentation zone. This migration may affect those organisms that are adapted to freshwater environments. It may also affect municipal water supplies.

NOTE: Possible actions to minimize adverse impacts regarding site characteristics can be found in Subpart H.

### Subpart D—Potential Impacts on Biological Characteristics of the Aquatic Ecosystem

NOTE: The impacts described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in Subpart B.

### § 230.30 Threatened and endangered species.

(a) An endangered species is a plant or animal in danger of extinction throughout all or a significant portion of its range. A threatened species is one in danger of becoming an endangered species in the foreseeable future throughout all or a significant portion of its range. Listings of threatened and endangered species as well as critical habitats are maintained by some individual States and by the U.S. Fish and Wildlife Service of the Department of the Interior (codified annually at 50 CFR 17.11). The Department of Commerce has authority over some threatened and endangered marine mammals, fish and reptiles.

(b) Possible loss of values: The major potential impacts on threatened or endangered species from the discharge of dredged or fill material include:

(1) Covering or otherwise directly killing species;

(2) The impairment or destruction of habitat to which these species are limited. Elements of the aquatic habitat which are particularly crucial to the continued survival of some threatened or endangered species include adequate good quality water, spawning and maturation areas, nesting areas, protective cover, adequate and reliable food supply, and resting areas for migratory species. Each of these elements can be adversely affected by

**Environmental Protection Agency** § 230.32

changes in either the normal water conditions for clarity, chemical content, nutrient balance, dissolved oxygen, pH, temperature, salinity, current patterns, circulation and fluctuation, or the physical removal of habitat; and

(3) Facilitating incompatible activities.

(c) Where consultation with the Secretary of the Interior occurs under section 7 of the Endangered Species Act, the conclusions of the Secretary concerning the impact(s) of the discharge on threatened and endangered species and their habitat shall be considered final.

§ 230.31 Fish, crustaceans, mollusks, and other aquatic organisms in the food web.

(a) Aquatic organisms in the food web include, but are not limited to, finfish, crustaceans, mollusks, insects, annelids, planktonic organisms, and the plants and animals on which they feed and depend upon for their needs. All forms and life stages of an organism, throughout its geographic range, are included in this category.

(b) Possible loss of values: The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consump-

tion by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced populations. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

§ 230.32 Other wildlife.

(a) Wildlife associated with aquatic ecosystems are resident and transient mammals, birds, reptiles, and amphibians.

(b) Possible loss of values: The discharge of dredged or fill material can result in the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem. These adverse impacts upon wildlife habitat may result from changes in water levels, water flow and circulation, salinity, chemical content, and substrate characteristics and elevation. Increased water turbidity can adversely affect wildlife species which rely upon sight to feed, and disrupt the respiration and feeding of certain aquatic wildlife and food chain organisms. The availability of contaminants from the discharge of dredged or fill material may lead to the bioaccumulation of such contaminants in wildlife. Changes in such physical and chemical factors of the environment may favor the introduction of undesirable plant and animal species at the expense of resident species and communities. In some aquatic environments lowering plant and animal species diversity may disrupt the normal functions of the ecosystem

and lead to reductions in overall biological productivity.

NOTE: Possible actions to minimize adverse impacts regarding characteristics of biological components of the aquatic ecosystem can be found in Subpart H.

### Subpart E—Potential Impacts on Special Aquatic Sites

NOTE: The impacts described in this subpart should be considered in making the factual determinations and the findings of compliance or non-compliance in Subpart B. The definition of special aquatic sites is found in § 230.3(q-1).

### § 230.40 Sanctuaries and refuges.

(a) Sanctuaries and refuges consist of areas designated under State and Federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources.

(b) Possible loss of values: Sanctuaries and refuges may be affected by discharges of dredged or fill material which will:

(1) Disrupt the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;

(2) Create unplanned, easy and incompatible human access to remote aquatic areas;

(3) Create the need for frequent maintenance activity;

(4) Result in the establishment of undesirable competitive species of plants and animals;

(5) Change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices;

(6) Result in any of the other adverse impacts discussed in Subparts C and D as they relate to a particular sanctuary or refuge.

### § 230.41 Wetlands.

(a)(1) Wetlands consist of areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.

(2) Where wetlands are adjacent to open water, they generally constitute the transition to upland. The margin between wetland and open water can best be established by specialists familiar with the local environment, particularly where emergent vegetation merges with submerged vegetation over a broad area in such places as the lateral margins of open water, headwaters, rainwater catch basins, and groundwater seeps. The landward margin of wetlands also can best be identified by specialists familiar with the local environment when vegetation from the two regions merges over a broad area.

(3) Wetland vegetation consists of plants that require saturated soils to survive (obligate wetland plants) as well as plants, including certain trees, that gain a competitive advantage over others because they can tolerate prolonged wet soil conditions and their competitors cannot. In addition to plant populations and communities, wetlands are delimited by hydrological and physical characteristics of the environment. These characteristics should be considered when information about them is needed to supplement information available about vegetation, or where wetland vegetation has been removed or is dormant.

(b) Possible loss of values: The discharge of dredged or fill material in wetlands is likely to damage or destroy habitat and adversely affect the biological productivity of wetlands ecosystems by smothering, by dewatering, by permanently flooding, or by altering substrate elevation or periodicity of water movement. The addition of dredged or fill material may destroy wetland vegetation or result in advancement of succession to dry land species. It may reduce or eliminate nutrient exchange by a reduction of the system's productivity, or by altering current patterns and velocities. Disruption or elimination of the wetland system can degrade water quality by obstructing circulation patterns that flush large expanses of wetland systems, by interfering with the filtration function of wetlands, or by changing the aquifer recharge capability of a

wetland. Discharges can also change the wetland habitat value for fish and wildlife as discussed in Subpart D. When disruptions in flow and circulation patterns occur, apparently minor loss of wetland acreage may result in major losses through secondary impacts. Discharging fill material in wetlands as part of municipal, industrial or recreational development may modify the capacity of wetlands to retain and store floodwaters and to serve as a buffer zone shielding upland areas from wave actions, storm damage and erosion.

§ 230.42 Mud flats.

(a) Mud flats are broad flat areas along the sea coast and in coastal rivers to the head of tidal influence and in inland lakes, ponds, and riverine systems. When mud flats are inundated, wind and wave action may resuspend bottom sediments. Coastal mud flats are exposed at extremely low tides and inundated at high tides with the water table at or near the surface of the substrate. The substrate of mud flats contains organic material and particles smaller in size than sand. They are either unvegetated or vegetated only by algal mats.

(b) Possible loss of values: The discharge of dredged or fill material can cause changes in water circulation patterns which may permanently flood or dewater the mud flat or disrupt periodic inundation, resulting in an increase in the rate of erosion or accretion. Such changes can deplete or eliminate mud flat biota, foraging areas, and nursery areas. Changes in inundation patterns can affect the chemical and biological exchange and decomposition process occurring on the mud flat and change the deposition of suspended material affecting the productivity of the area. Changes may reduce the mud flat's capacity to dissipate storm surge runoff.

§ 230.43 Vegetated shallows.

(a) Vegetated shallows are permanently inundated areas that under normal circumstances support communities of rooted aquatic vegetation, such as turtle grass and eelgrass in estuarine or marine systems as well as a number of freshwater species in rivers and lakes.

(b) Possible loss of values: The discharge of dredged or fill material can smother vegetation and benthic organisms. It may also create unsuitable conditions for their continued vigor by: (1) Changing water circulation patterns; (2) releasing nutrients that increase undesirable algal populations; (3) releasing chemicals that adversely affect plants and animals; (4) increasing turbidity levels, thereby reducing light penetration and hence photosynthesis; and (5) changing the capacity of a vegetated shallow to stabilize bottom materials and decrease channel shoaling. The discharge of dredged or fill material may reduce the value of vegetated shallows as nesting, spawning, nursery, cover, and forage areas, as well as their value in protecting shorelines from erosion and wave actions. It may also encourage the growth of nuisance vegetation.

§ 230.44 Coral reefs.

(a) Coral reefs consist of the skeletal deposit, usually of calcareous or silicaceous materials, produced by the vital activities of anthozoan polyps or other invertebrate organisms present in growing portions of the reef.

(b) Possible loss of values: The discharge of dredged or fill material can adversely affect colonies of reef building organisms by burying them, by releasing contaminants such as hydrocarbons into the water column, by reducing light penetration through the water, and by increasing the level of suspended particulates. Coral organisms are extremely sensitive to even slight reductions in light penetration or increases in suspended particulates. These adverse effects will cause a loss of productive colonies which in turn provide habitat for many species of highly specialized aquatic organisms.

§ 230.45 Riffle and pool complexes.

(a) Steep gradient sections of streams are sometimes characterized by riffle and pool complexes. Such stream sections are recognizable by their hydraulic characteristics. The rapid movement of water over a coarse substrate in riffles results in a rough

drawn. These regulations apply to all existing, proposed or potential disposal sites for discharges of dredged or fill material into waters of the United States, as defined in 40 CFR 230.2.

### § 231.2 Definitions.

For the purposes of this part, the definitions of terms in 40 CFR 230.2 shall apply. In addition, the term:

(a) "Withdraw specification" means to remove from designation any area already specified as a disposal site by the U.S. Army Corps of Engineers or by a state which has assumed the section 404 program, or any portion of such area.

(b) "Prohibit specification" means to prevent the designation of an area as a present or future disposal site.

(c) "Deny or restrict the use of any defined area for specification" is to deny or restrict the use of any area for the present or future discharge of any dredged or fill material.

(d) "Person" means an individual, corporation, partnership, association, Federal agency, state, municipality, or commission, or political subdivision of a state, or any interstate body.

(e) "Unacceptable adverse effect" means impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines (40 CFR Part 230).

(f) "State" means any state agency administering a 404 program which has been approved under section 404(h).

### § 231.3 Procedures for proposed determinations.

(a) If the Regional Administrator has reason to believe after evaluating the information available to him, including any record developed under the section 404 referral process specified in 33 CFR 323.5(b), that an "unacceptable adverse effect" could result from the specification or use for specification of a defined area for the disposal of dredged or fill material, he may initiate the following actions:

(1) The Regional Administrator will notify the District Engineer or the state, if the site is covered by an approved state program, the owner of record of the site, and the applicant, if any, in writing that the Regional Administrator intends to issue a public notice of a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification, whichever the case may be, of any defined area as a disposal site.

(2) If within 15 days of receipt of the Regional Administrator's notice under paragraph (a)(1) of this section, it has not been demonstrated to the satisfaction of the Regional Administrator that no unacceptable adverse effect(s) will occur or the District Engineer or state does not notify the Regional Administrator of his intent to take corrective action to prevent an unacceptable adverse effect satisfactory to the Regional Administrator, the Regional Administrator shall publish notice of a proposed determination in accordance with the procedures of this section. Where the Regional Administrator has notified the District Engineer under paragraph (a)(1) of this section that he is considering exercising section 404(c) authority with respect to a particular disposal site for which a permit application is pending but for which no permit has been issued, the District Engineer, in accordance with 33 CFR 325.8, shall not issue the permit until final action is taken under this part.

COMMENT: In cases involving a proposed disposal site for which a permit application is pending, it is anticipated that the procedures of the section 404 referral process will normally be exhausted prior to any final decision of whether to initiate a 404(c) proceeding.

(b) Public notice of every proposed determination and notice of all public hearings shall be given by the Regional Administrator. Every public notice shall contain, at a minimum:

(1) An announcement that the Regional Administrator has proposed a determination to prohibit or withdraw specification, or to deny, restrict, or